# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW MEXICO

**LESLIE** and **JACK MILLER**,
on behalf of their minor child, **S.M.**,

        Plaintiff,

    vs.                           No. **CIV 05-502 MCA/WPL**

**BOARD OF EDUCATION OF THE
ALBUQUERQUE PUBLIC SCHOOLS,**

        Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the parties' briefing regarding Plaintiffs' claims under the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. §§ 1400 to 1487,[1] [Doc. 46, 52, 55] and the following motions: (1) *Defendant APS' Motion to Strike Plaintiffs' Designated Expert Witness and to Prohibit Reliance Upon or Reference to the Report, Opinion and Conclusions of Such Witness* [Doc. 27] filed on January 3, 2006; (2) Plaintiffs' *Objection to Magistrate's Order* [Doc. 51] filed on March 23, 2006; (3) *Defendant APS' Motion for Summary Judgment on Plaintiffs' Section 504 and ADA Claims* [Doc. 56] filed on April 14, 2006; (4) Plaintiffs' *Motion to Bifurcate and Certify 23(b)(2)*

---

[1]The IDEA was amended in 2004, and these amendments became effective on July 1, 2005. See Pub. L. No. 108-446, 118 Stat. 2715 (2004). However, all references to the IDEA in this *Memorandum Opinion and Order* concern the version of the statute in effect before July 1, 2005, because the present action was filed before that date.

*Class* [Doc. 58] filed on April 14, 2006; and (5) Plaintiffs' *Motion for Consideration of Additional Evidence on Plaintiffs' IDEA Claims* [Doc. 59] filed on April 14, 2006.  Having considered the parties' submissions, the relevant law, and being otherwise fully advised in the premises, the Court grants in part and denies in part Defendant's *Motion to Strike*, denies Plaintiffs' *Motion to Bifurcate and Certify 23(b)(2) Class*, overrules Plaintiffs' *Objection to Magistrate's Order*,  grants Defendant's *Motion for Summary Judgment*, grants in part and denies in part Plaintiffs' *Motion for Consideration of Additional Evidence*, and affirms the portions of the Administrative Appeal Officer's (AAO's) decision which are challenged in Plaintiffs' *Complaint*.  As a result of these rulings, the only remaining issue in this case is whether Plaintiffs are entitled to an award of attorney fees for their counsel's work in the administrative proceedings.  The Court will vacate the scheduled trial date and order supplemental briefing on this remaining issue before entering a final judgment.

## I.    **<u>BACKGROUND</u>**

The history of this litigation is set forth in the *Memorandum Opinion and Order* [Doc. 30] filed on January 18, 2006, and the *Memorandum Opinion and Order* filed in <u>Board of Education of Albuquerque Public Schools v. Miller</u>, Civil No. 05-487 MCA/LFG (D.N.M. July 22, 2005).  This action originated as a challenge to the decision of an Administrative Appeal Officer (AAO) awarding equitable relief in an administrative proceeding conducted pursuant to the procedures set forth in IDEA.  At issue in the administrative proceeding was the public education that the student, S.M., received from Albuquerque Public Schools (APS) during the sixth, seventh, and eighth grade at Cleveland Middle School.  Part of the equitable

relief awarded by the AAO in that proceeding took the form of reimbursement for private educational services and assistive technology that Plaintiffs Leslie and Jack Miller purchased for S.M. through August 2005, just before the student started high school.   APS unsuccessfully attempted to enjoin this portion of the AAO's ruling in No. 05-487 MCA/LFG.

Soon after the filing of that action, Plaintiffs Leslie and Jack Miller filed the present civil action (No. 05-502 MCA/WPL) against APS challenging other portions of the AAO's decision under the IDEA and asserting additional claims under Section 504 of the Rehabilitation Act, 29 U.S.C. § 794a(a)(2), and Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. § 42 U.S.C. § 12132.   In their *Complaint* [Doc. 1], Plaintiffs identify the following issues which provide the basis for their IDEA claim challenging certain portions of the AAO's decision[2] that resulted from the administrative proceedings:   (1) whether the AAO applied the correct burden of proof; (2) whether the AAO erroneously deferred to Defendant's choice of Wilson Reading over Alternative Language Therapy (ALT) as a methodology for providing S.M. with reading instruction; (3) whether the AAO erroneously excluded evidence suggesting that Defendant's choice of methodology was the result of "predetermination" rather than an individualized consideration of S.M.'s educational needs; (4) whether the AAO erred in not finding a deprivation of Free

---

[2]Insofar as the AAO's decision incorporated or affirmed the prior rulings of the Due Process Hearing Officer (DPHO), the Court's references to the "AAO" or the "AAO's decision" encompass the decision of the DPHO as well.

Appropriate Public Education (FAPE) or awarding additional relief based on Defendant's alleged failures to provide more complete access to Books on Tape[3] during all relevant school years; and (5) whether the AAO erroneously excluded evidence regarding Defendant's alleged "systemic failure" in the provision of Books on Tape and failed to account for that failure as a cause of the alleged denial of FAPE to S.M.  Plaintiffs also seek an award of attorney fees under the IDEA.

The focus of Plaintiffs' *Complaint* is on two special educational needs:  (1) the need for remediation in the form of special instruction aimed at increasing reading skills or developing reading strategies that are tailored to the student's disability, and (2) the need for accommodation in the form of assistive technologies or aids that allow the student to convert written information to an auditory format so that he may keep up with other subjects at his grade level and function in a regular-education classroom notwithstanding the fact that he does not read at grade level.  As a factual matter, the parties dispute the adequacy or appropriateness of different methodologies aimed at meeting the student's need for remediation (*e.g.*, ALT versus Wilson Reading), as well as the adequacy or appropriateness of various approaches to meeting his need for accommodation (*e.g.*, Books on Tape versus the Kurzweil system).

As a legal matter, the parties also disagree as to whether Defendant has the authority to choose one means of meeting these special educational needs when Plaintiffs prefer

---

[3]"Books on Tape" are cassette tapes or compact discs containing auditory recordings of books used in the APS curriculum.

-4-

another.  More specifically, Plaintiffs contend that Defendant loses the authority to make such choices when it is proven that, in past years, school personnel failed to meet the student's needs by any means, thereby forcing the parents to obtain private education using a particular methodology in order to meet these needs.  Plaintiffs also contend that there is a need for consistency in the means chosen and that Defendant should not be permitted to unilaterally change to a different means of meeting the student's needs after the student has become accustomed to using another.

In addition to their IDEA claims noted above, Plaintiffs' *Complaint* [Doc. 1] contains generic allegations that Defendant violated Section 504 of the Rehabilitation Act and Title II of the ADA.  In the *Initial Pretrial Report* [Doc. 17], Plaintiffs clarify that these generic allegations are premised on the following assertions:  (1) that Defendant fails to have a workable system in place for provision of Books on Tape to students with reading disabilities across the APS district, and (2) that consistent with a longstanding policy and practice of not offering the ALT method of reading instruction to students with reading disabilities, Defendant has intentionally refused to provide S.M. with the ALT method of reading instruction that he needs.

Plaintiffs primarily seek declaratory and injunctive relief in this action.  The parties have stipulated that Plaintiffs are not seeking compensatory damages for emotional distress, pain and suffering, loss of educational opportunity, or loss of future earning capacity.  [Doc. 20, 21, 47, 48.]  Insofar as Plaintiffs have continued to purchase private aids or services for the student after the period for which the AAO ordered reimbursement, however, Plaintiffs

may seek reimbursement for such additional aids or services not covered by the AAO's decision.

In addition to the claims and relief which are specific to S.M., Plaintiffs have moved to certify and bifurcate a claim on behalf of a class of APS students with specific learning disabilities in reading or dyslexia who allegedly are affected by a systemic failure to offer or provide Books on Tape throughout the school district. With respect to the claim on which they seek class certification, Plaintiffs pray for declaratory and injunctive relief on behalf of the entire class but do not seek compensatory damages.

The parties also are in dispute as to whether discovery should be expanded, and additional evidence considered, regarding Plaintiffs' contentions about the significance of Books on Tape and APS's alleged systemic failures in educating students with specific learning disabilities in reading or dyslexia. Specifically, Plaintiffs object to the Magistrate Judge's *Memorandum Opinion and Order* [Doc. 49] denying their motion to compel interrogatory responses and production of documents regarding the closing of APS's language clinic in 1998, the reallocation of APS resources and employees after that closing, and information about APS's provision of Books on Tape (or other means by which non-readers may access the general curriculum) to other students throughout the APS system over the course of several years. [Doc. 51.] And Defendant moves to strike the proposed testimony of Plaintiffs' expert regarding the significance of Books on Tape as a mechanism for educating students who have difficulty reading. [Doc. 27.]

Because the relevance of such expert testimony, as well as Plaintiffs' discovery requests, depends in part on whether this litigation will proceed as a class action, I first address the motion for class certification before turning to the evidentiary motions. After ruling on those motions, I will then analyze the merits of Plaintiffs' claims under the IDEA, ADA, and Section 504 based on my review of the Administrative Record and the admissible evidence submitted with the parties' briefing regarding the IDEA claim and Defendant's motion for summary judgment on the ADA and Section 504 claims.

## II.  **ANALYSIS**

### A.   **Plaintiffs' Motion to Bifurcate and Certify 23(b)(2) Class**

I address Plaintiffs' motion for class certification separately from the merits of their individual claims on behalf of S.M., because "[i]n determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met." Anderson v. City of Albuquerque, 690 F.2d 796, 799 (10th Cir.1982). Here Plaintiffs have moved to bifurcate and certify the following issue as a class action under Fed. R. Civ. P. 23(b)(2): whether Defendant APS violated the anti-discrimination provisions in Section 504 of the Rehabilitation Act and Title II of the ADA by having an intentionally dysfunctional infrastructure and system for offering Books on Tape that systematically fails to provide Books on Tape to a class of students who presently qualify for special education based on a specific learning disability in reading. Plaintiffs seek to have this issue tried separately

from their other claims under Fed. R. Civ. P. 42(a), and they seek only declaratory and injunctive relief for the proposed class.

Although Plaintiffs bear the burden of proving that this action qualifies for class certification, the Court must engage in its own "'rigorous analysis'" of whether the four threshold requirements of Rule 23(a) are satisfied. Shook v. El Paso County, 386 F.3d 963, 968 (10th Cir. 2004) (quoting Gen. Tel. Co. of the S.W. v. Falcon, 457 U.S. 147, 161 (1982)) (additional citation omitted). In particular, the Court must carefully examine whether: "(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). If these four threshold requirements are met, then an additional inquiry is necessary to determine whether the action falls within one of the three types of cases set forth in Rule 23(b). See Shook, 386 F.3d at 971.

Defendant asserts that the proposed class fails to meet these requirements because, among other things, the named Plaintiffs have made no showing that any other members of the proposed class have exhausted their administrative remedies with respect to the provision or denial of Books on Tape. The requirement of exhausting administrative remedies generally applies to all claims, including those arising under Section 504 of the Rehabilitation Act and Title II of the ADA, for which relief may be available under the

-8-

IDEA.  See 20 U.S.C. § 1415(*l*); Padilla ex. rel. Padilla v. Sch. Dist. No. 1, 233 F.3d 1268, 1274 (10th Cir. 2000).

The Tenth Circuit has cited or recognized exceptions to the exhaustion requirement, however, "when administrative remedies would be futile, when they would fail to provide relief, or when 'an agency has adopted a policy or pursued a practice of generally applicability that is contrary to the law'" which "'thereby renders agency expertise and the factual development of an administrative record less important.'" Urban v. Jefferson County Sch. Dist. R-1, 89 F.3d 720, 724 (10th Cir. 1996) (quoting Ass'n for Cmty. Living in Colo. v. Romer, 992 F.2d 1040, 1044 (10th Cir. 1993)); see, e.g., Robinson v. Kansas, 117 F. Supp. 2d 1124, 1142-43 (D. Kan. 2000), aff'd, 295 F.3d 1183 (10th Cir. 2002).  Under these exceptions, "[a]dministrative remedies are generally futile or inadequate when plaintiffs allege 'structural or systemic failure and seek systemwide reforms.'" Urban, 89 F.3d at 724 (quoting Romer, 992 F.2d at 1044).  "The same is true where plaintiffs assert violations of the IDEA's due process provisions." Romer, 992 F.2d at 1044.

In determining whether one or more of these exceptions to the exhaustion requirement apply, courts must consider the important purposes that the exhaustion requirement is designed to serve.  See Hoeft v. Tucson Unified Sch. Dist., 967 F.2d 1298, 1304 (9th Cir. 1992).  These purposes include:

> "(1) permitting the exercise of agency discretion and expertise on issues requiring these characteristics;  (2) allowing the full development of technical issues and a factual record prior to court review;  (3) preventing deliberate disregard and circumvention of agency procedures established by Congress;

and (4) avoiding unnecessary judicial decisions by giving the agency the first opportunity to correct any error."

Hayes v. Unified Sch. Dist. No. 377, 877 F.2d 809, 814 (10th Cir.1989) (quoting Ass'n for Retarded Citizens, Inc. v. Teague, 830 F.2d 158, 160 (11th Cir.1987) (citations omitted)). Where these purposes are not served by requiring exhaustion of administrative remedies, this requirement may be excused.  See Hoeft, 967 F.2d at 1304.

        While it may form an independent jurisdictional issue, the analysis of whether any members of the proposed class should be excused from the requirement of exhausting administrative remedies also is relevant to class certification for the following reasons.  First, differences between the class representatives and the other members of the proposed class with respect to exhausting administrative remedies affect the Court's determination of whether the class representatives and their counsel can fairly and adequately represent all members of the proposed class.

        The requirement of fair and adequate representation is perhaps the most important of the criteria for class certification set forth in Rule 23(a) because this requirement is grounded in the constitutional principle of protecting the other class members right to due process, see In re GMC Pick-Up Truck Fuel Tank Prod. Liab. Litig., 55 F.3d 768, 784 (3d Cir. 1995), as well as the ethical principle that "class attorneys, purporting to represent a class, also owe the entire class a  fiduciary duty once the class complaint is filed," id. at 801.  In order to ensure that class actions adhere to these principles, the Court must ask two questions:  "'(1) do the named plaintiffs and their counsel have any conflicts of interest with other class

members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?'" Rutter & Wilbanks Corp. v. Shell Oil Corp., 314 F.3d 1180, 1187-88 (10th Cir. 2002) (quoting Hanlon v. Chrysler Corp., 150 F.3d  1011, 1020 (9th Cir.1998)); see also Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 626 n. 20 (1997).  Such a conflict is likely to be present if the members of the proposed class are subject to the defense of failure to exhaust administrative remedies, while the class representatives are not. Cf. Gary Plastic Packaging v. Merrill Lynch, 903 F.2d 176, 180 (2nd Cir.1990) (concluding that class certification should be denied as to claims for which the proposed class representatives are subject to unique defenses that predictably will become a major focus of litigation).

Rule 23(a)'s requirements of commonality and typicality also tend to merge with the analysis of whether a failure to exhaust administrative remedies can be excused, because both analyses may depend on whether allegations of "systematic failure" rest on the resolution of a common question of law or fact, see J.B. ex rel. Hart v. Valdez, 186 F.3d 1280, 1289 (10th Cir. 1999), and whether all of the class members '"possess the same interest and suffer the same injury.'" East Texas Motor Freight System, Inc. v. Rodriguez, 431 U.S. 395, 403 (1977) (quoting Schlesinger v. Reservists Committee to Stop the War, 418 U.S. 208, 216 (1974)); accord Rector v. City and County of Denver, 348 F.3d 935, 949-50 (10th Cir. 2003).  If the Books on Tape issue unravels into a series of unrelated questions, interests, and injuries that are unique to each class member and not amenable to a uniform

group remedy, then neither class certification nor an exception to the exhaustion requirement is warranted.

Illustrative of this relationship between class certification and exhaustion of administrative remedies is <u>Romer</u>, 992 F.2d at 1044, where the Tenth Circuit dismissed a class-action lawsuit after concluding that none of the exceptions to the requirement of exhausting administrative remedies applied to the members of the proposed class. The <u>Romer</u> plaintiffs alleged that the Colorado Department of Education's (CDE's) "policies for extended school year ('ESY') and extended school day ('ESD') services denied children with disabilities individualized education programs tailored to each child's unique needs." <u>Id.</u> at 1042. "In particular, they claim[ed] that CDE has denied them appropriately individualized IEPs because its policies arbitrarily predetermine the duration of ESD and ESY services and use a single criterion to determine eligibility for ESY services." <u>Id.</u> at 1043.

At the time <u>Romer</u> was decided, the IDEA and its implementing regulations did not contain explicit requirements regarding ESD and ESY services. <u>See</u> Thomas F. Guernsey and Kathe Klare, <u>Special Education Law</u>, § 8.6, at 121 (2d ed. 2001) (noting that ESY requirements were added to the IDEA in 1997, and that agency regulations implementing these requirements were added in 1999). Instead, the ESD and ESY requirements in existence at the time <u>Romer</u> was decided were the result of judicial interpretations of the IDEA. <u>See, e.g.</u>, <u>Johnson ex rel. Johnson v. Indep. Sch. Dist. No. 4</u>, 921 F.2d 1022 (10th Cir. 1990).

Under these judicial interpretations, "the federal statute's mandate of a 'free appropriate public education' . . . includes the provision for a summer program [or ESY] *if appropriate* under a child's IEP."   Id. at 1030 (emphasis added).   In order to determine whether an ESD is appropriate for a particular child, the IEP team must consider and decide "'whether the benefits accrued to the child during the regular school year will be significantly jeopardized if he is not provided an educational program during the summer months.'"   Id. at 1028 (quoting   Alamo Heights Indep. Sch. Dist. v. State Bd. of Educ., 790 F.2d 1153, 1158 (5th Cir.1986)).   At the time Romer was decided, this "significant jeopardy" test provided only a "'general standard'" that "'must be applied to the individual by [those drafting and approving the IEP] in the same way that juries apply other general legal standards such as negligence and reasonableness.'"   Id. (quoting Alamo Heights Indep. Sch. Dist., 790 F.2d at 1158).   Relevant information to be used in applying this general standard included "not only retrospective data, such as past regression and rate of recoupment, but also . . . predictive data, based on the opinion of professionals in consultation with the child's parents as well as circumstantial considerations of the child's individual situation at home and in his or her neighborhood and community."   Id.

Because the version of the IDEA at issue in Romer created no entitlement to ESY or ESD services absent an individualized showing that such services are "appropriate" under a particular child's IEP, see Johnson, 921 F.2d at 1028, a challenge to a state agency's policies or criteria governing ESY or ESD services could not go forward without a "factually intensive inquiry into the circumstances of each individual child's case," Romer, 992 F.2d

at 1044.  Such a factually intensive inquiry is "'best resolved with the benefit of agency expertise and a fully developed administrative record.'"  Romer, 992 F.2d at 1044 (quoting Hoeft, 967 F.2d at 1305).  For these reasons, the Tenth Circuit declined to excuse the plaintiffs from exhausting their administrative remedies before filing suit in Romer, and their class action was dismissed.

I recently found Romer to be distinguishable from another case in which I certified a class of APS students under Fed. R. Civ. P. 23(b)(2) after determining that some members of the class were excused from exhausting their administrative remedies as to certain claims. See Barr-Rhoderick v. APS, No. 04-327 MCA/ACT, Doc. 189, 191 (D.N.M. filed Mar. 23, 2004) (unpublished memorandum opinions and orders denying motion for summary judgment in part and granting motion for class certification in part).  Barr-Rhoderick is distinguishable from Romer because the plaintiffs in the former case were not claiming a special service or entitlement (such as the ESY or ESD provisions) that is unique to the circumstances of special-education students and not routinely afforded to regular-education students.  Rather, the class that the Court certified in Barr-Rhoderick was claiming that the length of their school day should be the same as the regular school day to which all students are presumptively entitled under state and federal law, and the resolution of this claim boiled down to a discrete legal question of how to measure the length of the school day.

The case at bar is analogous to Romer and distinguishable from Barr-Rhoderick. Unlike the relatively straightforward question of determining the statutory minimum length of the school day to which all students are presumptively entitled, Plaintiffs have identified

-14-

no clear statutory or regulatory requirement that presumptively entitles all students to Books on Tape or establishes that Books on Tape are the only means or the best means for all students with disabilities that affect their reading skills to access the information provided in school textbooks and other written materials.  And unlike the relatively straightforward question of applying the statutory minimum length of the school day to a class of students already grouped together in a readily identifiable APS program during a particular time period, Plaintiffs have identified no logical mechanism by which to lump into one monolithic category all students throughout the APS system who qualify for special education based on some kind of disability that affects their reading skills.  The Administrative Record regarding Plaintiffs' claims alone is not sufficient to draw reliable conclusions about APS practices with respect to such a large category of students.

Rather, an individualized fact-intensive inquiry with the benefit of agency expertise and a fully developed administrative record as to each student is required to answer the question whether Books on Tape is the appropriate means to enable a particular student with a specific degree and kind of learning disability to access the information in the textbooks and other written materials that form part of a school's general curriculum at a particular classroom during a particular grade or school year.  Like the provision of  ESY and ESD services at issue in Romer, the appropriateness or necessity of providing Books on Tape is likely to depend on facts and circumstances unique to each student and cannot be determined through the type of abstract, legal inquiry that is amenable to class certification under Fed. R. Civ. P. 23(b)(2).

In the case of S.M., for example, the Administrative Record reflects that in addition to having a severe reading disability, the student was under medical treatment for Attention Deficit Hyperactivity Disorder (ADHD) and depression, which affected the student's attention and capacity for learning. [AR[4] at Ex. AA, BB.] There was conflicting evidence regarding whether or to what extent the student used Books on Tape willingly or with resistance. [Tr. Vol. I, at 211-12; Vol. II, at 185-86.] In addition, the student's access to alternative means of converting written information to an auditory format, such as the Kurzweil system, may have varied from year to year depending on classroom assignments. [Tr. Vol. I, at 140-41; Vol. II, at 30-32.] These are all factors that may vary from student to student and from school year to school year, thus making it impossible to generalize about the appropriateness or necessity of Books on Tape for all students who have difficulty reading.

While it also bears on the requirement of exhausting administrative remedies, the need for an individualized fact-intensive inquiry undertaken with the benefit of agency expertise and a fully developed administrative record as to each student means that the Books on Tape issue does not meet the requirements for class certification under Fed. R. Civ. P. 23(a) and 23(b)(2). The same factors which underlie the exhaustion requirement also show a lack of

---

[4]The Administrative Record includes two bates-stamped stacks of pleadings containing decisions of the DPHO and the AAO, as well as two three-ring binders containing the parties' exhibits. These documents are referenced in this *Memorandum Opinion and Order* by their bates-stamp number or exhibit number, preceded by the acronym "AR." The Administrative Record also contains several volumes of transcripts, which are referenced herein by their volume and page number, preceded by the abbreviation "Tr."

commonality, typicality, and adequacy of representation needed for class certification of this issue.

Plaintiffs assert that such a denial of class certification based on the factors relevant to exhausting administrative remedies places them in a "Catch 22" position because the administrative tribunals wherein they must exhaust such remedies have denied them the opportunity to present evidence regarding the allegedly system-wide problem they seek to cure. Even in light of such assertions, however, it is important to note that adjudication before courts and administrative tribunals is not the only mechanism for effecting changes in school policy, and class certification under Fed. R. Civ. P. 23 is not a broad license for federal courts to usurp the policy-making roles of other branches of state or local government.

In deciding whether it is appropriate to pursue system-wide policy changes by certifying a class under Fed. R. Civ. P. 23(b)(2), courts also need to examine whether the proposed class action is judicially manageable and whether the members of the proposed class are amenable to the type of uniform group remedies that a federal court is authorized to provide under the applicable law in this context. See Shook, 386 F.3d at 973. Such an examination needs to take into account the fact that some problems within a school system, although systematic and potentially affecting large numbers of students, simply are not amenable to adjudication and instead require changes in policy by democratic means through legislation and rulemaking. Seeking resolution of such problems by means of an adjudication in an administrative or judicial forum may be futile not because school officials are

-17-

circumventing the law, but because the existing law simply does not allow courts or administrative tribunals to reach the problem by means of an adjudication.

Plaintiffs, for example, may prefer a policy that is much more pro-active in making Books on Tape freely available to any and all APS students.  But this Court's authority to move Defendant toward such a policy is limited to adjudicating a particular case or controversy regarding the existing and more general requirements of the IDEA, Section 504 of the Rehabilitation Act, and Title II of the ADA which are pleaded in Plaintiff's *Complaint*. The statutory scheme in which these more general requirements are included imposes an additional limitation on the Court's power by requiring the exhaustion of administrative remedies.  Thus, fashioning a uniform group remedy or effecting a system-wide policy change is not a manageable task for the Court to perform when a fully developed administrative record as to the class members is crucial to the Court's resolution of the issue on which class certification is sought, yet such a record is unavailable because the most of the class members have not exhausted administrative remedies as to that issue.

In light of my conclusion that class certification under Fed. R. Civ. P. 23(b)(2) is not warranted in this action, it follows that there is no need to bifurcate the Books on Tape issue from the rest of Plaintiffs' claims.   Accordingly, Plaintiffs' *Motion to Bifurcate and Certify 23(b)(2) Class* [Doc. 58] is denied.

### B.      **Plaintiffs' Objection to Magistrate Judge's Discovery Ruling**

In addition to seeking class certification of the Books on Tape issue, Plaintiffs have filed an objection [Doc. 51] to the Magistrate Judge's *Memorandum Opinion and Order*

[Doc. 49] denying their motion to compel interrogatory responses and production of documents regarding the closing of APS's language clinic in 1998, the reallocation of APS resources and employees after that closing, and information about APS's provision of Books on Tape (and other means by which non-readers may access the general curriculum) throughout the APS system over the course of several years.  The Magistrate Judge's ruling concerned a nondispositive pretrial matter, and thus I will not sustain Plaintiffs' objection unless they show that this ruling is clearly erroneous or contrary to law.  See Fed. R. Civ. P. 72(a); 28 U.S.C. 636(b)(1)(A) (1994); Comeau v. Rupp, 810 F. Supp. 1127, 1167 (D. Kan. 1992).

In support of their objection, Plaintiffs assert that the Magistrate Judge's ruling erroneously prejudged the merits of their claims and conflated the scope of discovery available for an IDEA claim with that available for claims under Section 504 of the Rehabilitation Act and Title II of the ADA.  This assertion is unfounded.  While the Magistrate Judge's *Memorandum Opinion and Order* does discuss the substantive law pertaining to the claims asserted in Plaintiffs' *Complaint*, this discussion only provides a backdrop for applying the appropriate standard for a discovery ruling under Fed. R. Civ. P. 26.  And while it is true that Plaintiffs' IDEA claims are not identical to their other claims in every respect, the fact that the Court and the parties already have the benefit of the full Administrative Record developed during the IDEA proceedings regarding this particular student is a relevant factor to be considered in determining the scope of additional discovery.

Applying Fed. R. Civ. P. 26, the Magistrate Judge did not err in limiting the scope of Plaintiffs' discovery requests as articulated in the *Memorandum Opinion and Order* [Doc. 49] filed on March 13, 2006.  To the extent that the Magistrate Judge's ruling was premised on any predictions about the likelihood that the Court would decline to certify the proposed class regarding the Books on Tape issue, those predictions were borne out by the Court's ruling on Plaintiffs' motion for class certification.  The denial of that motion leaves Plaintiffs even less ground upon which to seek discovery regarding extraneous matters that do not concern the public education APS provided to S.M. during his middle-school years.

### C.    **Defendant's Motion to Strike Plaintiff's Expert**

During discovery, Plaintiffs produced certain information regarding a proposed expert witness, Patricia Davies Useem, whose testimony Plaintiffs intend to offer.  This information consists of the following:  (1) a letter from Plaintiffs' counsel dated November 21, 2005, enclosing Ms. Useem's resume documenting her education and experience; (2) a letter from Plaintiffs' counsel dated November 29, 2005, enclosing an unsigned copy of Ms. Useem's report, which consists of a five-page, single-spaced document in which Ms. Useem responds to three detailed questions posed by Plaintiffs' counsel regarding the use of audio recordings and other technologies to assist students who are unable to read printed books because of learning disabilities; and (3) a letter from Plaintiffs' counsel dated December 5, 2005, disclosing Ms. Useem's fee and the fact that she has not authored any articles in the last ten years or testified as an expert in the last four years.  [Ex. A, B, C, D to Doc. 27; Ex. 1, 2 to Doc. 31.]

On January 3, 2006, Defendant moved to strike Ms. Useem's proposed testimony and to prohibit Plaintiffs from introducing her report, opinions, or conclusions as evidence in this case.  Defendant's motion is based primarily on the contention that the information provided by or on behalf of Ms. Useem does not satisfy the requirements for an expert report under Fed. R. Civ. P. 26(a)(2)(B).  Secondarily, Defendant also asserts that to the extent Ms. Useem's expert report is considered complete and timely under that rule, the opinions contained therein do not satisfy the requirements for admission of expert testimony under Fed. R. Evid. 702.

I agree with Defendant that if Ms. Useem's expert report is to be considered a full and complete submission under Fed. R. Civ. P. 26(a)(2)(B), then Plaintiffs cannot make major substantive revisions to that report at a later date--after the deadline for expert reports has expired--in order to make up for deficits that render the opinions stated in the report inadmissible under Fed. R. Evid. 702.  Applying the factors articulated in Jacobsen v. Deseret Book Co., 287 F.3d 936, 952-53 (10th Cir. 2002), I conclude that Defendant would be incurably prejudiced if Plaintiffs were allowed to supplement Ms. Useem's report in this manner at a later date, because that would effectively preclude Defendant from meeting the pretrial deadline for filing and briefing of motions to exclude expert testimony pursuant to Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 141 (1999), and Daubert v. Merrell-Dow Pharm., Inc., 509 U.S. 579, 592-93 (1993).  Such action also would effectively preclude the Court from timely performing the gatekeeping function required under those decisions.

I do not agree, however, that Ms. Useem's report should be entirely stricken from the record at this juncture as a sanction for failure to comply with Fed. R. Civ. P. 26(a)(2)(B). Rather, the proper remedy is to limit Ms. Useem's proposed testimony to the matters she has disclosed in her report.

To the extent those matters do not add up to an opinion that would be admissible under Fed. R. Civ. P. 702,  Defendant moves to preclude Plaintiffs from introducing Ms. Useem's testimony under the guise of an expert opinion.  In considering such a motion before trial and without a hearing, the Court assumes for purposes of analysis that Plaintiffs would be able to present the substantive information in Ms. Useem's report by means of either deposition testimony or live testimony under oath, and thus I do not necessarily require her opinions to be submitted in a form that is admissible at this juncture.

Applying the standards for relevance and reliability articulated in Daubert and its progeny, I conclude that Ms. Useem's report provides a sufficient basis on which to offer testimony regarding her personal experiences in observing the students with whom she has worked or the various technologies they have used.  And based on her personal experiences, she can provide background information as to what materials are available through Books on Tape or how to work the equipment for listening to such audio recordings.

Courts routinely admit testimony by members of other professions, such as law-enforcement, that is based their personal experience regarding methods of operation or "tools of the trade" used by the population they are charged with monitoring.  See, e.g., United States v. Becker, 230 F.3d 1224, 1231 (10th Cir. 2000) (concluding that a trial court did not

plainly err in admitting a law-enforcement agent's testimony regarding tools of the drug-trafficking trade); United States v. Davis, 397 F.3d 173, 178-79 (3d Cir. 2005) (concluding that a police officer's testimony about "the methods of operation for drug traffickers in the South Philadelphia area" was admissible).  I see no reason why a different rule should apply to the testimony of an experienced educator which explains the tools or methods used by an identifiable group or class of students she is charged with monitoring.

But it would be erroneous to conclude that such testimony amounts to a relevant and reliable expert opinion with respect to the narrower question of whether Defendant has broken the law in failing to provide Plaintiff S.M. with Books on Tape on a particular occasion when Ms. Useem's report does not indicate that she has ever worked with this student or reviewed the record in his case.  On this narrower question, I find that Ms. Useem's report does not provide a relevant and reliable basis for her to offer an expert opinion that Books on Tape is the only appropriate technology, or the best technology available, for meeting S.M.'s need for accommodation during the relevant time period.  I similarly find that Ms. Useem's report is not admissible under Fed. R. Evid. 702 for the purpose of showing that Books on Tape is the only appropriate techology, or the best technology available, for accommodating all students with learning disabilities under all circumstances.

Ms. Useem's opinions about other students besides Plaintiff S.M., or about the benefits of Books on Tape to a general category of students with learning disabilities, are of limited relevance here because the Court has denied Plaintiffs' motion to certify a class, and

the remaining issues require individualized determinations based on the specific facts and circumstances of Plaintiff S.M.'s case.  Ms. Useem's report does not indicate that she examined or worked with S.M., nor does it indicate that Ms. Useem has undertaken any review of the Administrative Record in this case to identify any specific defects or problems in the services or equipment provided to this student during the time period at issue here.

Without such information in her report, there is no reliable basis for drawing the inference that Ms. Useem's generalized opinions about a broad category of students with learning disabilities have any application to the particular facts and circumstances of Plaintiff S.M.'s case during the relevant time period.  "Although it is not always a straightforward exercise to disaggregate method and conclusion, when the conclusion simply does not follow from the data, a district court is free to determine that an impermissible analytical gap exists between premises and conclusion."  Bitler v. A.O. Smith Corp., 400 F.3d 1227, 1233 (10th Cir.2004) (citing General Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997)).

Such analytical gaps are present in Ms. Useem's report insofar as it bears on providing assistive technology for S.M. during his middle school years.  Although her report makes passing references to research, conversations with publishers, and personal experiences with students other than Plaintiff S.M., for the most part it consists of mere conclusions without any specific, reasoned explanation as to the premises or data from which they are drawn. The report does not lay out the intermediate steps in Ms. Useem's reasoning that identify a set of objective, professional standards or a tested, peer-reviewed methodology that leads her to prefer Books on Tape over other sources or methods of accessing the information from

school textbooks and other written materials.  The report also fails to provide the necessary premises or background information about learning disabilities that would establish a reliable basis for the conclusion that Books on Tape is invariably the best and most appropriate means available for all students with such disabilities to access written materials in a school's curriculum, regardless of the student's own preferences, the degree or severity of the student's disability, other disabilities or medical issues which affect the student's capacity to learn, or the surrounding circumstances in the classroom or family environment.

For these reasons, Defendant's *Motion to Strike* [Doc. 27] is granted in part with respect to expert opinion on the subjects identified above.  Defendant's motion is denied in part with respect to those portions of Ms. Useem's report which simply convey her personal experiences working with Books on Tape as a trained observer.

### D. <u>Plaintiffs' Motion to Present Additional Evidence</u>

In addition to the information provided in Ms. Useem's report, Plaintiffs have moved to supplement the Administrative Record regarding S.M.'s IDEA proceedings with other evidence that they have gathered during discovery.  [Doc. 59.]  In particular, Plaintiffs seek to introduce additional evidence that the DPHO and AAO excluded in the administrative proceedings with regard to:  (1) whether Defendant made a predetermination not to provide ALT reading instruction when closing its language clinic in 1998, and (2) whether there are system-wide problems hindering APS students' ability to access Books on Tape.  Plaintiffs also seek to introduce additional evidence of events that transpired after the conclusion of

the administrative proceedings to show that Defendant is not complying with the relief awarded by the AAO and/or that Plaintiffs are entitled to additional relief.

In determining whether to consider such evidence for purposes of the IDEA claims asserted in Plaintiffs' *Complaint*, the Court must keep in mind the unique standard of review that applies to judicial review of administrative proceedings conducted pursuant to the IDEA.[5]  The Tenth Circuit recently articulated this standard as follows:

> A district court applies a modified de novo standard in reviewing a hearing officer's decision under the IDEA.  It looks at the record of the administrative proceedings and decides, based on a preponderance of the evidence, whether the requirements of the IDEA are met.  In so doing, it must give 'due weight' to the hearing officer's findings of fact, which are considered prima facie correct.  Although the district court may accept additional evidence, such evidence is merely supplemental to the administrative record.  The district court's proceedings must maintain the character of review and not rise to the level of a de novo trial.

L.B. and J.B. ex rel. K.B. v. Nebo Sch. Dist., 379 F.3d 966, 973-74 (10th Cir. 2004) (citations omitted).  In adopting this standard, the Tenth Circuit cited with approval the Ninth Circuit's opinion in Ojai Unified Sch. Dist. v. Jackson, 4 F.3d 1467, 1472-73 (9th Cir.1993), which in turn borrowed from the First Circuit's reasoning in  Town of Burlington v. Department of Educ., 736 F.2d 773, 791 (1st Cir.1984).

_____

[5]The Court's ruling on Plaintiffs' motion applies only to their IDEA claims.  With the exception of the requirement of exhausting administrative remedies, the parties have identified no limitations on the standard of review applicable to Plaintiffs' Section 504 and ADA claims that would require them to seek leave of the Court before submitting evidence pertaining to those claims which is outside the Administrative Record.

In <u>Town of Burlington</u>, 736 F.2d at 790, the First Circuit construed the "additional evidence" clause in 20 U.S.C. § 1415(e)(2)

> to mean supplemental.  Thus construed, this clause does not authorize witnesses at trial to repeat or embellish their prior administrative hearing testimony;  this would be entirely inconsistent with the usual meaning of "additional."  We are fortified in this interpretation because it structurally assists in giving due weight to the administrative proceeding, as <u>[Bd. of Educ. v.] Rowley</u>, [458 U.S. 176, 206 (1982),] requires.

> A trial court must make an independent ruling based on the preponderance of the evidence, but the Act contemplates that the source of the evidence generally will be the administrative hearing record, with some supplementation at trial.  The reasons for supplementation will vary;  they might include gaps in the administrative transcript owing to mechanical failure, unavailability of a witness, an improper exclusion of evidence by the administrative agency, and evidence concerning relevant events occurring subsequent to the administrative hearing.  The starting point for determining what additional evidence should be received, however, is the record of the administrative proceeding.

<u>Id.</u> (citations and footnotes omitted).  Under this standard, "[t]he determination of what is 'additional' evidence must be left to the discretion of the trial court which must be careful not to allow such evidence to change the character of the hearing from one of review to a trial de novo."  <u>Id.</u> at 791.  In ruling on motions to present additional evidence, "a court should weigh heavily the important concerns of not allowing a party to undercut the statutory role of administrative expertise, the unfairness involved in one party's reserving its best evidence for trial, the reason the witness did not testify at the administrative hearing, and the conservation of judicial resources."  <u>Id.</u>

The Court also must keep in mind that this case presents an unusual situation where Plaintiffs are appealing from an administrative proceeding at which they prevailed and

received some form of equitable relief as to most of the substantive issues. The "harmless error" rule applies to evidentiary rulings in this context because the IDEA does not give Plaintiffs the right to bring a civil action for judicial review of the administrative proceedings conducted pursuant to that statute unless and until they are "aggrieved" by the result of those proceedings. See 20 U.S.C. § 1415(i)(2)(A); Robinson v. Pinderhughes, 810 F.2d 1270, 1275 (4th Cir. 1987). It follows that there is no basis for this Court to review evidentiary rulings with respect to those issues on which the AAO found in Plaintiffs' favor and awarded adequate relief. So long as the AAO found an IDEA violation and provided an adequate remedy, Plaintiffs cannot claim that they are prejudiced by the AAO's decision not to consider additional evidence regarding those issues.

Applying the standard of review articulated above, I conclude that it is not necessary or appropriate to convene an evidentiary hearing in this matter in order to receive additional evidence on Plaintiffs' IDEA claims. As stated previously in my ruling on Defendant's motion to strike Ms. Useem's expert report, I will not consider the opinions stated in that report as establishing a general principle that Books on Tape is always the best means available, or the only means available, for accommodating students with difficulty reading. I will, however, take into account Ms. Useem's report insofar as it merely provides background information on issues such as the types of information available through Books on Tape or how to work the technology for listening to Books on Tape.

I also conclude that neither the DPHO nor the AAO erred in excluding or limiting the evidence of Defendant's systemic practices or policies regarding the provision or ALT or

Books on Tape to other students at different time periods.  The relationship of that evidence to the remaining issues on which Plaintiffs are aggrieved is too attenuated.  In particular, I find that the evidence concerning the alleged predetermination not to offer ALT reading instruction after Defendant's language clinic closed in 1998 would become relevant to the remaining issues in this case *only* if Plaintiffs first established that:  (1) ALT was the only appropriate and available methodology or program for providing S.M. with reading instruction that is reasonably calculated to provide the student with a meaningful educational benefit during the relevant time period, (2) Defendant failed to provide ALT to S.M. during that time period, and (3) the AAO failed to award adequate compensatory relief for that failure.  Similarly, the evidence concerning alleged systemic failures in allowing other students throughout the school district to access Books on Tape over the course of several years would become relevant to the remaining issues in this case *only* if Plaintiffs first established that:  (1) Books on Tape was the only appropriate and available mechanism for giving S.M. access to the written materials in question during the relevant time period, (2) Defendant failed to provide Books on Tape to S.M. during that time period, and (3) the AAO failed to award adequate compensatory relief for that failure.

For the reasons set forth in the discussion of the merits of Plaintiffs' IDEA claims, I find that these preconditions are not met.  Therefore, any error in the AAO's decision not to admit further evidence of Defendant's systemic shortcomings with regard to the availability of ALT and Books on Tape was harmless.

The final category of additional evidence that Plaintiffs seek to introduce at this juncture concerns events that occurred after the school years covered by the AAO's decision of April 4, 2005. Plaintiffs claim this evidence is relevant to show that Defendant is not complying with the equitable relief awarded by the AAO, and to show why additional relief is warranted at this juncture. Defendant responds that Plaintiff's *Complaint* does not assert a claim for failure to comply with the AAO's decision and that this action is limited to the review of actions taken during S.M.'s middle school years, not his current or subsequent years in high school.

I agree with Defendant that Plaintiffs may not present additional evidence in this case as a means of circumventing the requirement that they first exhaust their administrative remedies with respect to challenging actions that occurred after the school years covered by the AAO's decision. See Urban, 89 F.3d at 725. The Court would need the benefit of a fully developed Administrative Record spanning that additional time frame in order to properly review such decisions, see id., and to proceed with an evidentiary hearing as to subsequent events without the benefit of such a record would cause this action to lose "the character of review and . . . rise to the level of a de novo trial" that is not consistent with the standard applicable to an IDEA claim. See L.B. and J.B. ex rel. K.B., 379 F.3d at 973-74.

I also agree with Defendant that Plaintiffs did not plead a claim for non-compliance with the relief awarded by the AAO in their *Complaint*, and it is too late to amend their pleading to include such a claim in this action. That a student is aggrieved by a school district's failure to comply with an administrative tribunal's decision in favor of the student

is a separate and distinct claim that may rest on an entirely different legal theory than the relatively straightforward IDEA, Section 504, and ADA claims asserted in Plaintiffs' *Complaint*. See, e.g., Robinson, 810 F.2d at 1274-75 (concluding that such non-compliance can be addressed under 42 U.S.C. § 1983).

Further, Plaintiffs have not moved to amend their *Complaint* to add such a new claim within the case-management deadlines established in the *Initial Pretrial Report* or other scheduling orders. Accordingly, the question whether such an amendment should be permitted at this late juncture is governed by the standard articulated in Fed. R. Civ. P. 16(b) and D.N.M. LR-Civ. P. 16.1. See Rowen v. State of N.M., 210 F.R.D. 250, 252 (D.N.M. 2002) (collecting cases). Under these rules, modification of the deadlines contained in the *Initial Pretrial Report* or in other scheduling orders requires a showing of good cause and Court approval. See Fed. R. Civ. P. 16(b); D.N.M. LR-Civ. 16.1; Rowen, 210 F.R.D. at 252. "'The primary measure of Rule 16's "good cause" standard is the moving party's diligence in attempting to meet the case management order's requirements.'" Rowen, 210 F.R.D. at 252 (quoting Bradford v. Dana Corp., 249 F.3d 807, 809 (8th Cir. 2001)). Under this standard, "the Court may grant leave to modify the pretrial schedule and amend the complaint under Rule 16(b) only if the schedule 'cannot reasonably be met despite the diligence of the party seeking the extension.'" Id. (quoting Johnson v. Mammoth Recreations, Inc., 975 F.2d 604, 609 (9th Cir.1992)). Prejudice to the adverse party is also a factor to be considered. See Leary v. Daeschner, 349 F.3d 888, 907-08 (6th Cir. 2003).

-31-

In this case, I find that Plaintiffs do not meet the standard of Fed. R. Civ. P. 16(b) and D.N.M. LR-Civ. 16.1 because they have not shown diligence in trying to meet the existing deadline for amendment of their pleading, and Defendants would be unduly prejudiced by the timing of such an amendment.  In this regard, I note that very early in this litigation, the parties filed a *Stipulation* [Doc. 7] indicating that Plaintiffs rejected the Wilson reading instruction that Defendant offered to S.M. during the Fall of 2005 and agreed not to pursue any legal action against Defendant associated with that rejection except as to the issues raised in this case.  The provision or rejection of Wilson reading instruction during the Fall of 2005 or subsequent semesters is not one of the issues raised in Plaintiffs' pleading in this case, nor have Plaintiffs timely raised any other issues pertaining to the Fall 2005 semester and beyond.  Accordingly, the Court will not consider additional evidence concerning events within that time frame in ruling on Plaintiffs' IDEA claims.

The result of the analysis provided above is that Plaintiffs' motion to consider additional evidence for purposes of their IDEA claims is granted in part with respect to the admissible portions of Ms. Useem's report and denied in part in all other respects.   This ruling only applies to Plaintiffs' IDEA claims and does not impact Plaintiffs' authority to submit evidence outside the Administrative Record concerning their ADA and Section 504 claims.

### E.   Merits of Plaintiffs' IDEA Claims

I next turn to the merits of Plaintiffs' IDEA claims.  As the first issue in their *Complaint*, Plaintiffs asserted that the AAO and DPHO applied an incorrect burden of proof

in the administrative proceedings.  In their IDEA briefs, however, Plaintiffs appear to have abandoned this issue in light of the Supreme Court's ruling in Schaffer ex rel. Schaffer v. Weast, 126 S. Ct. 528 (2005).  "The burden of proof in an administrative hearing challenging an IEP is properly placed upon the party seeking relief."  Id. at 537.  When, as here, the parents are presenting an IDEA challenge on behalf of a student, then the AAO was correct in concluding that they bear the burden of proof.  See id.  "But the rule applies with equal effect to school districts:  If they seek to challenge an IEP, they will in turn bear the burden of persuasion before an ALJ."  Id.

While the Supreme Court's recent ruling resolves the burden-of-proof issue raised in Plaintiffs' *Complaint*, the reasoning behind this ruling also informs this Court's approach to the other IDEA issues that Plaintiffs have raised.  Plaintiffs' substantive claims under the IDEA are inextricably linked to the question of which party bears the burden of proof because the premise underlying these claims is that when parents disagree with a school district and take an adversarial stance regarding the choice of a particular educational methodology or technology for their student, courts and administrative tribunals should resolve the disagreement in favor of the parents and not give any deference to the school district's choices.

Congress and the Supreme Court have repeatedly explained why this premise should not be blindly accepted in IDEA cases.  "The core of the statute . . . is the *cooperative process* that it establishes between parents and schools," and "[t]he central vehicle for this *collaboration* is the IEP process."  Id. at 532 (emphasis added).  Adopting a rule that the

-33-

school district *always* bears the burden of proving that it was correct in resolving a disagreement with a parent over an Individualized Education Plan (IEP) would upset this cooperative process because it would mean that "every IEP is invalid until the school district demonstrates that it is not" in an adversarial proceeding.  Id. at 536.  Such a presumption would increase the incentive for parents and school officials to take an adversarial stance and litigate all their disagreements instead of making full use of the cooperative process envisioned by the statute's drafters.  See id.

Increasing the incentives to litigate instead of cooperate also undermines the purposes of the statute by diverting the limited resources of school districts and parents from education to administration.  In this regard, the Supreme Court observed that "there is reason to believe that a great deal is already spent on the administration of the Act.  Litigating a due process complaint is an expensive affair, costing schools approximately $8,000-to-$12,000 per hearing."  Id. at 535.  Paying attorney-fee awards also adds significantly to the administrative costs borne by school districts.

> In fiscal year 1998, for example, the [District of Columbia] school district paid over $10 million to attorneys.  That same year, the *Washington Post* reported that legal representation of special education students, once 'an obscure niche,' had developed into a 'booming, lucrative industry.'  Doug Struck and Valerie Strauss, Special Ed Law Is Big Business;  *Students' Attorneys Collectively Receiving Millions in Fees*, THE WASH. POST, July 20, 1998, at B7.  Describing special education cases as 'easy [to] win,' the Post stated that 'when the city's school system is crying for money to try to build an adequate special education system--and thereby begin to lessen the flood of legal challenges--these attorney fees rankle school officials who say the money should be spent on children.'  Id.

Calloway v. District of Columbia, 216 F.3d 1, 4 (D.C. Cir. 2000).  In light of such concerns,

> Congress has also repeatedly amended the Act in order to reduce its administrative and litigation-related costs. For example, in 1997 Congress mandated that States offer mediation for IDEA disputes. Individuals with Disabilities Education Act Amendments of 1997, Pub.L. 105-17, § 615(e), 111 Stat. 90, 20 U.S.C. 1415(e). In 2004, Congress added a mandatory 'resolution session' prior to any due process hearing. Individuals with Disabilities Education Improvement Act of 2004, Pub.L. 108-446, § 615(7)(f)(1)(B), 118 Stat. 2720, 20 U.S.C.A. § 1415(f)(1)(B) (Supp.2005). It also made new findings that '[p]arents and schools should be given expanded opportunities to resolve their disagreements in positive and constructive ways,' and that '[t]eachers, schools, local educational agencies, and States should be relieved of irrelevant and unnecessary paperwork burdens that do not lead to improved educational outcomes.' §§ 1400(c)(8)-(9)."

Schaffer, 126 S. Ct. at 535-36.

Congressional intent to rein in administrative and litigation-related costs occasioned by the IDEA also is evident in recent appropriations acts for the District of Columbia school system, which (unlike most local school districts) falls directly under Congress' budgeting authority.

> Responding to the concerns expressed in the *Post* article, the House Committee on Appropriations, while considering the District's fiscal year 1999 appropriations request, acted to stem 'the growth in legal expenses ... and the usurping of resources from education to pay attorney fees.' H.R. Rep. 105-670, at 50 (1998). The Committee adopted an appropriations rider that, in order to allow DCPS to 'focus more clearly on teaching and learning rather than on litigation and expensive legal fees,' limited the District's fee payments under IDEA. Id. Eventually becoming section 130 of the 1999 D.C. Appropriations Act, the rider imposed caps on both the hourly rate and total amount of compensation the District could pay lawyers of parents who prevail in IDEA actions and proceedings.

Calloway, 216 F.3d at 4. Congress continued to include such caps on attorney-fee payments in subsequent appropriations acts for the District of Columbia. See id. at 5 (discussing fiscal

year 2000 legislation); <u>Whatley v. District of Columbia</u>, 447 F.3d 814, 816-17 (D.C. Cir. 2006) (discussing legislation for fiscal years 1999 through 2005).

The Supreme Court placed still more limits on the litigation-related expenses occasioned by the IDEA when it recently held that the statute does not authorize courts to award expert fees to prevailing parties in administrative proceedings conducted pursuant to that statute.  <u>See</u> <u>Arlington Central Sch. Dist. Bd. of Educ. v. Murphy</u>, 126 S. Ct. 2455, 2457 (2006).  There the Court again rejected the notion that a blank check for litigating IDEA claims is necessary to further "the Act's overarching goal of 'ensur[ing] that all children with disabilities have available to them a free appropriate public education,' 20 U.S.C. § 1400(d)(1)(A), as well as the goal of 'safeguard[ing] the rights of parents to challenge school decisions that adversely affect their child.'" <u>Id.</u> at 2463.  "The IDEA obviously does not seek to promote these goals at the expense of all other considerations, including fiscal considerations."  <u>Id.</u>  "It is at least conceivable, moreover, that capping fees will produce additional resources for direct educational services, and that, despite limiting parents' ability to use litigation as a means of enforcing IDEA, [such fee caps] . . . will yield a net benefit for disabled children."  <u>Calloway</u>, 216 F.3d at 9.

I similarly conclude that the goals of the statute are not furthered by adopting the presumptions that Plaintiffs favor here, <i>i.e.</i>, that Defendant must be wrong whenever its personnel do not choose Plaintiffs' preferred methods of reading instruction (ALT) and of converting written information to an auditory format (Books on Tape).  The notion that school districts are in violation of the IDEA whenever they do not comply with parents'

requests as to a particular method of instruction has been rejected by a number of courts, including our Tenth Circuit.  See O'Toole ex rel. O'Toole v. Olathe Dist. Schs. Unified Sch. Dist. No. 233,  144 F.3d 692, 709 (10th Cir. 1998) (citing  Lachman v. Illinois State Bd. of Educ., 852 F.2d 290, 292 (7th Cir.1988));  Logue v. Unified Sch. Dist. No. 512, 153 F.3d 727, 1998 WL 406787, at *6 (10th Cir. July 16, 1998) (unpublished disposition).  "The right to provide meaningful input is simply not the right to dictate an outcome and obviously cannot be measured by such."  White v. Ascension Parish Sch. Bd., 343 F.3d 373, 380 (5th Cir. 2003).

The IDEA does not give district courts free rein to choose "between the views of conflicting experts on a controversial issue of educational policy--effective methods of educating dyslexic students--in direct contradiction of the opinions of state administrative officers who had heard the same evidence."  Grim v. Rhinebeck Central Sch. Dist., 346 F.3d 377, 383 (2d Cir. 2003); accord E.S. v. Independent Sch. Dist., No. 196, Rosemount-Apple Valley-Eagan, 135 F.3d 566, 569 (8th Cir. 1998).  "Beyond the broad questions of a student's general capabilities and whether an educational plan identifies and addresses his or her basic needs, courts should be loathe to intrude very far into interstitial details or to become embroiled in captious disputes as to the precise efficacy of different instructional programs."  Roland M. v. Concord Sch. Committee, 910 F.2d 983, 992 (1st Cir. 1990) (citing Rowley, 458 U.S. at 202).

With respect to S.M.'s need for remediation in the form of special instruction to improve his reading skills, the AAO in this case found that Defendant complied with the

IDEA's requirements in the student's sixth-grade year but did not comply with these requirements in his seventh and eighth-grade years. As part of the remedy for the violations pertaining to reading instruction during the seventh and eighth-grade years, the AAO ordered Defendant to reimburse Plaintiffs for the private educational services and aids they purchased from private sources, including private ALT tutoring through August 2005, just prior to the student's ninth-grade school year. In so ruling, the AAO did not endorse ALT or a particular instructor as the only appropriate means of teaching S.M. to read, but simply concluded that some degree of reimbursement for the private tutoring selected by the parents during the seventh and eighth grades was an appropriate and equitable remedy for the violations that occurred during those years.

Plaintiffs contend that Defendant should have provided S.M. with one-on-one reading instruction using the ALT method from the beginning of his sixth-grade school year onward, and that the appropriate relief for the failure to do so is to require Defendant to provide or pay for such ALT instruction not only for past years, but also throughout the student's high-school career (*i.e.*, ninth grade through twelfth grade). Underlying these contentions is the factual premise that, from the outset, ALT was and is the only available method of reading instruction that suffices to provide S.M. with the FAPE to which students are entitled under the IDEA.

Under Schaffer, 126 S. Ct. at 537, it is Plaintiffs' burden to prove that this premise is correct. They have not done so. See Grim, 346 F.3d at 383; E.S., 135 F.3d at 569.

At the due-process hearing, Plaintiffs elicited testimony from the private tutor, Lucy Landis, whom they employed to provide S.M. with ALT after school during seventh and eighth grades.  Ms. Landis testified as to why she thought ALT was better than some other methods of reading instruction for dyslexic students, why she thought it was important for the student to continue in one-on-one sessions with the same Academic Language Therapist instead of changing programs or instructors, and why she thought the student should not be exposed to other forms of reading while receiving ALT.  [Tr. Vol. II, at 95-96, 98-99, 107, 116-17, 119-20.]

Ms. Landis' testimony on these points, however, was disputed by other witnesses. Dr. Anne Tafoya, an instructional manager for special education at APS who holds advanced degrees in Special Education and Administration, testified that:  "Academic Language Therapy and Wilson Reading are very, very similar programs.  I mean you can interchange the programs.  They're not that different. . . .  [S]tudents move from one program to the other . . . ."  [Tr. Vol. III, at 132-34, 176.]  Dr. Tafoya also testified that "Language!" and "Morgan Dynamic Phonics" are similar programs that are based on the "Orton-Gillingham" approach set forth in the literature of the International Dyslexia Association.  [Tr. Vol. III, at 154, 159, 201, 210-11; AR at Ex. 10.]  And Dr. Tafoya made note of recent research suggesting that dyslexic students may learn better in small-group settings than in one-on-one sessions.  [Tr. Vol. III, at 141-42.]

Melissa Stotts, a learning disabilities coordinator at APS who is certified as an Academic Language Therapist, disagreed entirely with Ms. Landis' opinion that the student

should not be exposed to other forms of reading while receiving ALT.  [Tr. Vol. III, at 303-04.]  Ms. Stotts also corroborated Dr. Tafoya's testimony that "Morgan Dynamic Phonics," "Patterns for Success," and "Language!" are all "Orton-Gillingham based programs."  [Tr. Vol. III, at 283-84.]   In particular, Ms. Stotts noted that "the International Dyslexia Association has a website where multisensory language education programs are listed. Language! is one of those.  It's an Orton-based multisensory program . . . ."  [Tr. Vol. III, at 302.]

I conclude that neither the DPHO nor the AAO erred in resolving these disputed issues concerning the relative merits of ALT versus other methodologies or programs by crediting the expertise offered by school personnel such as Dr. Tafoya and Ms. Stotts.  After careful review of the Administrative Record, I agree with the AAO and the DPHO that ALT is one of several methods or programs of reading instruction which could meet the IDEA's requirements with respect to this particular student if properly implemented.   While the parents' and student's preferences should be taken into account in the cooperative process envisioned by this statute, the fact that school personnel ultimately decided not to offer or provide ALT in a one-on-one setting to S.M. during sixth, seventh, and eighth grade does not amount to a *per se* violation of this statute.  See Grim, 346 F.3d at 383; E.S., 135 F.3d at 569.

The next question is whether Defendant did, in fact, properly implement some other acceptable form of reading instruction tailored to S.M.'s special needs during the portion of his middle-school years which form the basis for Plaintiffs' IDEA claims in this case.  Again,

I agree with the DPHO and the AAO that acceptable forms of reading instruction were properly implemented during S.M.'s sixth-grade year. The DPHO's findings on this point are well-supported and were affirmed on review by the AAO. [AR at 0015-16, 00286, 00289.]

When the student's IEP team met and moved him to a different classroom with a less experienced teacher during the first semester of his seventh-grade year, the AAO found that the student no longer received consistent, properly implemented reading instruction using one of the acceptable Orton-Gillingham based methodologies while at school. According to the AAO's decision, the problem during the seventh-grade year was not necessarily the lack of one-on-one sessions with an Academic Language Therapist, but the failure to provide some other, suitable alternative with a qualified teacher and an appropriate grouping of students. The AAO found that this problem was exacerbated by the failures to reconvene the IEP team when the student did not make progress and the parents requested a change in placement. [AR at 00290-91.] Such deficiencies continued during S.M.'s eighth-grade year, according to the findings of both the DPHO [AR at 00021] and the AAO [AR at 00291-92].

I have no occasion to review the findings of the AAO and the DPHO regarding these violations during the seventh and eighth grade, because the administrative tribunals found in Plaintiffs' favor as to these violations, and thus Plaintiffs are not "aggrieved" by such findings within the meaning of the IDEA. See Robinson, 810 F.2d at 1275. Plaintiffs may, however, claim that they are aggrieved by the AAO's decision as to the *remedy* for these violations, if they can demonstrate how and why the equitable relief awarded by the AAO

is not adequate to correct any deficiencies in the reading instruction provided to S.M. during his seventh and eighth-grade years.  The relevant relief awarded by the AAO consists of:  (1) reimbursement for the private ALT tutoring that Plaintiffs purchased from Ms. Landis from March 2004 until August 2004 and from the first day of the 2004-2005 school year until the Student began high school; (2) a psycho-educational evaluation and a speech-language evaluation aimed at assisting the student's IEP team to determine appropriate instructional strategies to be employed to address the student's future needs; (3) placement in a Tier III reading program utilizing a systematic, phonetically-based approach to reading, taught in a small, homogenous group, to be determined by reconvening the IEP team and giving consideration to the compatibility of the selected reading program's compatibility with the student's ALT instruction and the results of the psycho-educational and speech-language evaluations.  [AR at 00023, 00031-32, 00302-03.]

Plaintiffs contend that this relief is inadequate, and they demand that Defendant provide and pay for S.M. to receive ALT during the school day for the 2005-2006 school year and the indefinite future.  They make this contention not only to ensure consistency with the private tutoring that Plaintiffs purchased from Ms. Landis in past years, but also because they believe that in light of the past violations, Defendant should forfeit whatever right it has to participate in deciding what constitutes an appropriate method or program for S.M.'s reading instruction in future years.

I find Plaintiffs' contentions concerning the inadequacy of the relief awarded by the AAO to be without merit and not in accordance with the cooperative process that Congress

envisioned when enacting and amending the IDEA.  I agree with the AAO that "[i]t is error here to assume that Student's current needs will continue unchanged [in future years] . . . and to bind the District to certain practices which may not reflect Student's evolving needs." [AR at 00302.]  Without the necessary evaluations and IEP meetings ordered by the AAO, it is impossible to make an informed, collaborative decision regarding an appropriate placement for S.M. during the period following the AAO's decision.  After careful review of the Administrative Record, I conclude that the prospective relief awarded by the AAO strikes an appropriate and equitable balance between the need to account for these factors and the countervailing need to set boundaries on the school district's discretion so that the problems which led to the past violations of the IDEA do not recur and there is some level of consistency in the student's reading instruction.

I next turn to Plaintiffs' allegations regarding the use of Books on Tape.  As noted above, Books on Tape is one of the special aids or assistive technologies that may be used to convert written information from a visual to an auditory format so that the student may keep up with other subjects at his grade level and function in a regular-education classroom notwithstanding the fact that he does not read at grade level.  Such aids or technologies are legally relevant here because they help to accommodate the student's education in the Least Restrictive Environment (LRE), as mandated by the IDEA.

As in the controversy over the methods of reading instruction discussed above, there are several types of aids or assistive technologies that accomplish the same basic purpose of converting written information from a visual to an auditory format, *e.g.*,  Books on Tape, the

Kurzweil system, the Wynn Program, and "reading buddies."  Plaintiffs presented the report of Ms. Useem which discusses various advantages that Books on Tape may have for some students with whom she has worked.  [Ex. 1 to Doc. 31.]  There also was testimony from APS personnel praising the Kurzweil system [Tr. Vol. I, at 140-41, 242-43], and Ms. Landis, the student's private ALT tutor, spoke in favor of using a "reading buddy," *i.e.*, an adult or peer "who can sit beside the student and read necessary instructions, math word problems, and materials."  [Tr. Vol. II, at 114-15; Ex. 10.]  Finally, Plaintiffs purchased and were reimbursed for the Wynn program, "which is basically the same thing as Kurzweil" [Tr. Vol. II, at 280; AR at 00302], but which Plaintiffs thought would be a little less costly and easier to use.  [Tr. Vol. I, at 280; Vol. IV, at 33-38.]

The consistent use of any of these aids or assistive technologies, alone or combination, may have sufficed to enable S.M. to make educational progress and to support his placement in the LRE during his middle-school years.  For essentially the same reasons discussed above with respect to the debate over ALT versus Wilson Reading, it is not the Court's role to choose "between the views of conflicting experts on a controversial issue of educational policy--effective methods of educating dyslexic students--in direct contradiction of the opinions of state administrative officers who had heard the same evidence," Grim, 346 F.3d at 383, or "to become embroiled in captious disputes as to the precise efficacy of different instructional programs." Roland M., 910 F.2d at 992 (citing Rowley, 458 U.S. at 202).  Thus, the provision of some alternative form of assistive technology, such as the Kurzweil system, in lieu of Books on Tape is not a *per se* violation of the IDEA in this case.

It is true, however, that the student's IEP for the seventh grade specifically called for Books on Tape, and the AAO found instances during seventh and eighth grade where Defendant failed to provide any of these aids or assistive technologies in the classroom on a consistent basis.  [AR at 00300.]  The relief awarded by the AAO and DPHO to remedy these violations included:  (1) a requirement that Defendant reimburse Plaintiffs for their purchase of the Wynn program; (2) a requirement to prepare IEPs for the student in the Spring in order to determine if Books on Tape are necessary for the following school year and to allow sufficient lead time to order and obtain such Books on Tape; and (3) a requirement to conduct further evaluations regarding occupational therapy (OT) and assistive technology (AT), as follows:

> The District shall conduct an OT and AT evaluation of Student.  In addition to assessing Student's need for occupational therapy to improve his handwriting skills, these evaluations shall include an assessment of what auditory text-reading services and what keyboarding or other writing technology (including the possibility of a laptop computer) is needed by Student to provide FAPE in the LRE as well as what additional compensatory services or technology might provide Student with greater educational benefit.

> After the AT and OT evaluations are complete, Student's IEP team, with the OT and AT evaluators as members of the team, shall determine what OT and AT services and technology are appropriate for Student.  The IEP team should consider and include in Student's IEP not only what OT and AT services are necessary to provide Student a FAPE, but also what additional services and/or technology, above the minimal amount or type needed to allow Student to benefit from his special education, would benefit Student.

[AR at 00300-303.]

In her decision, the AAO provided a well-reasoned explanation for ordering further evaluations and meetings by the IEP team with respect to this issue instead of simply binding

the student and the school district to a particular kind of aid or technology in future years without the benefit of such evaluations. "The problem, of course, is that because the evaluations have not been conducted, it is impossible to know what occupational therapy services, new technology, or training, if any, is appropriate for Student. . . . The better approach is to decide, based on the denial of FAPE, that Student is entitled to compensatory services if he can benefit from them, and to allow Student's IEP team to determine what compensatory services are appropriate for Student after the OT and AT evaluations are completed." [AR at 00298.]

As with the controversy over ALT, Plaintiffs are not aggrieved by the AAO's findings in their favor regarding violations of the IDEA based on the failure to provide Books on Tape on an adequate and consistent basis during the student's seventh and eighth grade years. Instead, the question before me in this action is whether the AAO should have found additional IDEA violations regarding Books on Tape and awarded further relief with respect to such violations.

The answer to this question is no. The AAO's decisions as to the scope and duration of the violations relating to Books on Tape and the relief awarded to remedy such violations are firmly supported by the evidence in the Administrative Record. The AAO also tailored such relief to the commendable goal of restoring the cooperative process that Congress and the Supreme Court have envisioned for implementing the IDEA. This cooperative process favors the type of evaluations, meetings, and use of a school district's expertise that are

entailed by the AAO's decision, in lieu of a court order binding the parties to a particular methodology or technology.

For the reasons previously articulated, I also conclude that Ms. Useem's report regarding the advantages of Books on Tape does not undermine the AAO's decision, and it is not necessary to hear additional evidence regarding any systemic failures in offering Books on Tape to other students or in other school years.  The issue here is the special education needs of S.M. during his middle-school years, and I find that the relief crafted by the AAO provides an adequate and appropriate remedy with respect to the Books on Tape issue.  So long as the AAO awarded adequate relief for the violations which are supported by the evidence of record concerning this particular student, it does not matter whether the AAO could have reached the same result by considering additional evidence concerning Defendant's practices with respect to other students or at other times.  For all of the above reasons, the AAO's decision is affirmed as to all IDEA issues raised in Plaintiffs' *Complaint*.

**F.**      **Defendant's Motion for Summary Judgment on § 504  & ADA Claims**

In addition to their IDEA claims, Plaintiffs' *Complaint* generally alleges that Defendant violated Section 504 of the Rehabilitation Act and Title II of the ADA.  Where Section 504 and ADA claims follow on the heels of an IDEA claim in this manner, other courts have reasoned that a plaintiff "cannot establish a viable claim under the non-IDEA causes of action, where the predicate acts, upon which he has premised those claims, have withstood judicial review under the IDEA."  Moubry v. Independent Sch. Dist., 696, Ely, Minn., 9 F. Supp. 2d 1086, 1108-09 (D. Minn. 1998).  When the process mandated by the

IDEA produces an administrative decision that is upheld on judicial review, "principles of issue and claim preclusion may properly be applied to short-circuit redundant claims under other laws" such as the ADA and Section 504.   Independent Sch. Dist. No. 283 v. S.D., 88 F.3d 556, 562 (8th Cir. 1996); see Urban, 89 F.3d at 727-28; Pace v. Bogalusa City Sch. Dist., 403 F.3d 272, 290-97 (5th Cir. 2005) (en banc).

Applying these authorities to this case, I conclude that Plaintiffs' ADA and Section 504 claims are precluded or "short-circuited" insofar as (1) the predicate acts upon which Plaintiffs base those claims (*i.e.*, the alleged shortcomings regarding ALT and Books on Tape) are the same acts which form the basis for their IDEA claims, and (2) the AAO's decision on Plaintiffs' IDEA claims has withstood judicial review in this civil action.   It follows that Plaintiffs may not use the ADA and Section 504 to obtain further equitable relief based on the issues already reviewed by this Court in the IDEA proceedings.

It is important to note, however, that the Court's review and affirmance of the AAO's decision is limited to the IDEA claims stated in Plaintiffs' *Complaint* [Doc. 1] on which Plaintiffs are "aggrieved" within the meaning of the IDEA, *i.e.*, whether the AAO should have found additional violations of the IDEA pertaining to the provision of ALT and Books on Tape, and whether the AAO should have awarded additional equitable relief with respect to the violations that she did find with respect to Books on Tape and reading-instruction methodologies.   The limited scope of these IDEA claims is significant, because principles of issue preclusion and claim preclusion do not necessarily apply to *judicially unreviewed* rulings that administrative tribunals make pursuant to the IDEA.   See N.T. v. Espanola Pub.

-48-

Schs., No. CIV. 04-415 MCA/DJS, slip. op. at 10-14 (D.N.M. June 21, 2005) (unpublished memorandum opinion and order citing JSK ex rel. JK v. Henry County Sch. Bd., 941 F.2d 1563, 1567-68 (11th Cir. 1991); Drinker v. Colonial Sch. Dist., 888 F. Supp. 674, 680 (E.D. Pa. 1995), aff'd on other grounds, 78 F.3d 789 (3rd Cir. 1996); and I.D. ex rel. E.D. v. Westmoreland Sch. Dist., 788 F. Supp. 634, 641 (D.N.H. 1992)).  Application of preclusion doctrines to such unreviewed rulings by administrative tribunals would produce an absurd result because if they were to be given preclusive effect *before* a court reviews them, then courts would have no occasion to review the merits of such rulings and the portions of the statute providing for such judicial review would become superfluous.  See id.

It is also important to note that the standard of judicial review which applies to an independent claim under the ADA or Section 504 may differ from the standard that applies to judicial review of an administrative tribunal's decision under the IDEA.  While courts may adjudicate IDEA claims by reviewing the administrative record rather than conducting a *de novo* trial, see, e.g., L.B. and J.B. ex rel. K.B., 379 F.3d at 973-74, Section 504 and ADA claims may be subject to the more traditional standard for granting summary judgment under Fed. R. Civ. P. 56, which focuses on whether there are disputed issues of material fact which must be resolved by the factfinder at trial, see, e.g., Swenson v. Lincoln County Sch. Dist. No. 2, 260 F. Supp. 2d 1136, 1141-42 (D. Wyo. 2003) (applying summary-judgment standard to Section 504 and ADA claims where there was no viable IDEA claim to review).

Under the traditional summary-judgment standard, a non-movant cannot rely on the filing of an administrative record alone and must instead present and cite specific evidence

as to the essential elements of the relevant claim or defense.  Judgment is appropriate "as a matter of law" if the non-moving party has failed to make an adequate showing on an essential element of a claim or defense for which the movant does not bear the burden of proof at trial.  See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 670-71 (10th Cir. 1998).  And when the movant is also the party bearing the burden of persuasion at trial on the claim for which he or she is seeking summary judgment, the movant must show that the record as a whole satisfies each essential element of his or her case and negates any affirmative defenses in such a way that no rational trier of fact could find for the non-moving party.  See 19 Solid Waste Dep't Mechanics v. City of Albuquerque, 156 F.3d 1068, 1071 (10th Cir. 1998); Newell v. Oxford Mgmt., Inc., 912 F.2d 793, 795 (5th Cir. 1990); United Missouri Bank of Kansas City, N.A. v. Gagel, 815 F. Supp. 387, 391 (D. Kan. 1993).

Here Plaintiffs' response to Defendant's motion for summary judgment on their ADA and Section 504 claims does not attach or cite to specific evidence in support of each essential element of these claims.  Curiously, none of the additional evidence to which Plaintiffs allude in their motion regarding their IDEA claims is attached to their response regarding their ADA and Section 504 claims.  Instead, Plaintiffs' response cites the portions of the AAO's decision which ruled in their favor and asserts that they are entitled to summary judgment on their ADA and Section 504 claims because those portions of the AAO's decision found that Defendant violated the IDEA.

The portions of the AAO's decision which found in Plaintiffs' favor have no preclusive effect on their ADA and Section 504 claims, because Plaintiffs are not "aggrieved" by those portions of the AAO's decision, and consequently they have not been subjected to judicial review in this action.  See Robinson, 810 F.2d at 1275 (concluding that a party must be "aggrieved" by the portion of an administrative tribunal's decision on which that party seeks judicial review); N.T., No. 04-415 MCA/DJS, supra, slip. op. at 10-14 (collecting cases which support that proposition that judicially unreviewed findings of an IDEA administrative tribunal have no preclusive effect).  Similarly, the Court did not undertake judicial review of the merits of the AAO's decision  in Board of Education of Albuquerque Public Schools v. Miller, Civil No. 05-487 MCA/LFG (D.N.M. July 22, 2005). None of the parties produced the Administrative Record for judicial review in that case, and the issue of enjoining the reimbursement ordered by the AAO was instead resolved on the basis of the IDEA's "stay put" provisions, 20 U.S.C. § 1415(j), which apply *before* judicial review is initiated or completed.

Even if the IDEA violations pertaining to reading instruction and Books on Tape that are documented in the AAO's decision are considered violations of the ADA and Section 504 as well, Plaintiffs have not come forward with specific evidence showing a disputed issue of material fact as to the relief they seek for these violations.  It is a general rule in civil actions that a plaintiff may not recover twice for the same injury, and the Supreme Court has applied this rule in other contexts where two or more statutes provide overlapping benefits and do not require an election of remedies.  See United States v. Brown, 348 U.S. 110, 111

n. (1954) (citing United States v. Brooks, 176 F.2d 482, 484 (4th Cir. 1949)).  To the extent that the AAO already awarded equitable relief under the IDEA that remains in place under that statute's "stay put" provisions and is no longer subject to challenge, it would appear that Plaintiffs' ADA and Section 504 claims are moot insofar as they merely serve as means of duplicating the equitable relief previously awarded under the IDEA.  See Bd. of Educ. of Albuquerque Public Schools v. Miller, No. 05-487 MCA/LFG, supra (discussing mootness and "stay-put" provisions).

It is true that, unlike the equitable relief awarded in IDEA proceedings, courts can award compensatory damages for *intentional* violations of the ADA and Section 504.  See Powers v. MJB Acquisition Corp., 184 F.3d 1147, 1153 (10th Cir. 1999).  The elements of damages and intent, however, were not actually and necessarily decided in the administrative proceedings conducted pursuant to the IDEA.  See N.T., No. Civ. 04-415 MCA/DJS, supra, slip. op. at 20-21.  Thus, Plaintiffs cannot rely on the result of the IDEA proceedings to prove these elements; instead they must come forward with specific evidence creating a disputed issue of material fact as to their damages and the Defendant's intent in order to survive a motion for summary judgment.

In this case, Plaintiffs have stipulated that they are not seeking compensatory damages for emotional distress, pain and suffering, loss of educational opportunity, or loss of future earning capacity.  [Doc. 20, 21, 47, 48.]  And in response to Defendant's motion for summary judgment, Plaintiffs have not attached additional evidence or cited any portions of the record documenting any additional costs relating to ALT or Books on Tape for which

they seek reimbursement. Thus, the record is devoid of the kind of specific, admissible evidence necessary to support a reasonable inference that Plaintiffs have suffered additional damages beyond those items for which the AAO previously awarded reimbursement (and which the Court refused to enjoin in No. Civ. 05-487 MCA/LFG).

Given these stipulations and the absence of further evidence of compensatory damages, it appears that the focus of Plaintiffs' ADA and Section 504 claims is on obtaining declaratory and injunctive relief with respect to the student's high-school years, in addition to the equitable relief previously awarded by the AAO. As with Plaintiffs' IDEA claims, the Court cannot adjudicate whether conduct occurring after the Student's eighth-grade year violated the ADA and Section 504 because Plaintiffs have not yet exhausted their administrative remedies as to such conduct. See Padilla ex rel. Padilla, 233 F.3d at 1274 (concluding that exhaustion of the IDEA's administrative procedures and remedies is required whenever they could redress the plaintiff's alleged injuries "to any degree"); Cudjoe v. Indep. Sch. Dist. No. 12, 297 F.3d 1058, 1066 (10th Cir. 2002) (concluding that "the IDEA's exhaustion requirement will not be excused simply because a plaintiff requests damages"); Urban, 89 F.3d at 724 (requiring exhaustion of administrative remedies even when a party's objections to a subsequent IEP are the same as those raised in a previous IEP).

Further, Plaintiffs' *Complaint* does not plead a violation of the ADA or Section 504 that is premised on Defendant's failure to comply with the relief previously awarded by the AAO and affirmed by this Court in earlier sections of this *Memorandum Opinion and Order*.

Accordingly, I conclude that Plaintiffs have not come forward with specific, admissible evidence showing a disputed issue of material fact on each essential element of the ADA and Section 504 claims stated in their *Complaint*.  Therefore, Defendant is entitled to summary judgment on those claims.

**G.    Attorney Fees**

In light of the above rulings, I conclude that Plaintiffs have not prevailed on any of the substantive claims presented in their *Complaint*.   It follows that they and their counsel are not entitled to an award of attorney fees, costs, or other expenses for work performed in this civil action.  Plaintiffs did, however, prevail on a number of issues in the administrative proceedings which preceded this action, and their *Complaint* includes a prayer for attorney fees associated with the work performed in the administrative proceedings.  In their *Answer*, Defendant disputes that such an award is proper.   Thus, it appears that attorney fees associated with the administrative proceedings is the only remaining issue left for the Court to resolve after the filing of this *Memorandum Opinion and Order*.

Proceeding to trial when the only issue left to try is Plaintiffs' attorney fees for their work in an administrative proceeding under the IDEA would be a waste of resources that is totally contrary to the goals and purposes of this statute articulated by Congress and the Supreme Court.  Accordingly, I will vacate the scheduled trial date and instruct the parties to meet and confer as to whether they can reach an agreement as to attorney fees.  The parties are to jointly report the results of their meeting to the Court in writing by no later than August 8, 2006.  If no such agreement is reached by that date, I will order expedited briefing

on the issue of attorney fees associated with the administrative proceeding. Plaintiffs' brief on this issue must be filed and served by no later than August 15, 2006. Defendant's response must be filed and served by no later than August 22, 2006, and Plaintiffs' reply is due by no later than August 25, 2006.

III.   **CONCLUSION**

For the foregoing reasons, this Court will not certify a class that does not comply with Fed. R. Civ. P. 23, expand discovery beyond that contemplated in Fed. R. Civ. P. 26, admit expert opinions that do not comply with Fed. R. Evid. 702, or consider additional evidence on Plaintiffs' IDEA claims that conflicts with the standard of review provided in that statute. The Court affirms the AAO's decision as to all issues which are the subject of Plaintiffs' IDEA claims in this civil action, and Defendant's motion for summary judgment on Plaintiffs' ADA and Section 504 claims is granted.

**IT IS THEREFORE ORDERED** that *Defendant APS' Motion to Strike Plaintiffs' Designated Expert Witness and to Prohibit Reliance Upon or Reference to the Report, Opinion and Conclusions of Such Witness* [Doc. 27] is **GRANTED IN PART** and **DENIED IN PART** under the conditions set forth above.

**IT IS FURTHER ORDERED** that Plaintiffs' *Objection to Magistrate's Order* [Doc. 51] is **DENIED** and the Magistrate Judge's *Memorandum Opinion and Order* [Doc. 49] is **AFFIRMED**.

**IT IS FURTHER ORDERED** that the decision of the Administrative Appeal Officer is **AFFIRMED** as to all issues which are the subject of Plaintiffs' IDEA claims in this action, and (with the exception of the prayer for attorney fees associated with the administrative proceeding) Plaintiffs' IDEA claims are **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that *Defendant APS' Motion for Summary Judgment on Plaintiffs' Section 504 and ADA Claims* [Doc. 56] is **GRANTED** and Plaintiffs' ADA and Section 504 claims are **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that Plaintiffs' *Motion to Bifurcate and Certify 23(b)(2) Class* [Doc. 58] is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiffs' *Motion for Consideration of Additional Evidence on Plaintiffs' IDEA Claims* [Doc. 59] is **GRANTED IN PART** and **DENIED IN PART** under the conditions specified above.

**IT IS FURTHER ORDERED** that the parties shall comply with the following deadlines regarding the remaining issue of attorney fees:

1.      The parties must meet and confer as to whether they can reach an agreement on the remaining issues of attorney fees, and then jointly report the results of their meeting to the Court in writing by no later than August 8, 2006;

2.      If no such agreement is reached by the above date, Plaintiffs' brief on the issue of attorney fees associated with the administrative proceeding must be filed and served by no later than August 15, 2006;

-56-

3.      Defendant's response must be filed and served by no later than August 22, 2006;

4.      Plaintiffs' reply is due by no later than August 25, 2006.

**IT IS FURTHER ORDERED** that the Pretrial Conference scheduled for August 1, 2006, at 9 a.m., the Call of the Calendar scheduled for September 6, 2006, at 9 a.m, and the jury selection/trial and non-jury trial scheduled for September 12, 2006, at 9 a.m. are **VACATED**.

**SO ORDERED,** this 31st day of July, 2006, in Albuquerque, New Mexico.

**M. CHRISTINA ARMIJO**
United States District Judge